Amy Totenberg, United States District Judge *1360 On June 19, 2017, the jury entered a verdict on Plaintiff's infringement claims and found that Defendants had willfully violated Plaintiff's patent rights. (Doc. 632.) Following the jury's verdict, Plaintiff filed a Motion for Enhanced Damages [Doc. 644] that is now before the Court.
I. Background
In April 2004, Plaintiff Canon, Inc. ("Canon") developed and sold the first Set On III toner bottle that can be used in Canon copier machines. Defendant General Plastic Industrial Co., Ltd ("GPI") manufactures aftermarket toner bottles and cartridges, meaning they can be used in copiers and printers made by other companies, such as Canon. One of GPI's customers is Defendant Color Imaging, Inc. ("Color Imaging"), which purchases empty toner bottles from GPI, fills them with toner, and sells them in competition with Canon and other OEM (original equipment manufacturer) companies.
In 2005, GPI made an aftermarket version of Canon's Set On III toner bottles known as Type A and began selling it, including in the United States. In 2008, GPI made Type B bottles, another aftermarket version of Canon's Set On III toner bottles, and also sold it in the United States.
Canon applied for the '012 patent, the patent at issue in this case, on July 9, 2008, and the '012 patent issued on January 12, 2010. Soon after, Canon sued Densigraphix, one of GPI's customers, for infringing the '012 patent based on Densigraphix's sales of Type A and Type B bottles. GPI and Color Imaging both learned of the '012 patent and Canon's infringement allegations against Type A and Type B bottles in January 2010, when Densigraphix was sued. A few months later, Densigraphix entered into a consent order that provided for a permanent injunction in the case brought by Canon, and Densigraphix told GPI it could no longer sell Type A and Type B bottles.
GPI continued selling Type A bottles to U.S. customers for over a year after January 2010. GPI also continued selling Type B bottles, and in April 2011, Color Imaging began selling Type B bottles in the United States.
On September 15, 2011, Canon brought the current suit against GPI and Color Imaging for infringing three claims of the '012 patent. The case was litigated for several years and went to trial in June 2017. On June 19, 2017, the jury returned a verdict finding that Defendants had infringed the three claims of the '012 patent, that their infringement was willful, and that Defendants had not sufficiently proven their affirmative defenses. The jury awarded Canon $3,740,603 in damages for GPI's infringement and $730,380 for Color Imaging's infringement based on a reasonable royalty rate.
Plaintiff now moves for enhanced damages based on the jury's finding of willful infringement.
*1361 II. Discussion
If the jury or the district court finds in favor of the plaintiff in a patent infringement case, 35 U.S.C. § 284 requires the court to award damages to the plaintiff that are "adequate to compensate for the infringement." Section 284 further provides that the court "may increase the damages up to three times the amount found or assessed."
In its recent Halo Electronics, Inc. v. Pulse Electronics, Inc. decision, the Supreme Court "emphasized that the word 'may' clearly connotes discretion" and "there is no precise rule or formula for awarding [enhanced] damages under § 284." --- U.S. ----, 136 S.Ct. 1923, 1931, 195 L.Ed.2d 278 (2016) (internal quotations omitted). In particular, the Halo decision rejected the Federal Circuit's two-part test requiring a finding of objective recklessness before a district court could award enhanced damages. Id. at 1932. The Supreme Court in Halo characterized this two-part test as "unduly rigid" and instead held that, "[a]s with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." Id. at 1933. Just as a court is not bound to find "objective recklessness" before awarding enhanced damages, a court is also not bound to award enhanced damages after a finding of willfulness or egregious misconduct. Id. Yet the Supreme Court still limited a court's discretion to some extent, stating that enhanced damages "should generally be reserved for egregious cases typified by willful misconduct." Id. at 1934.
When reviewing the particular circumstances of a case, a district court may use the nine factors laid out in Read Corp. v. Portec, Inc. to help assess whether enhanced damages are appropriate:
1. Whether the infringer deliberately copied the ideas or design of another;
2. Whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
3. The infringer's behavior as a party to the litigation;
4. The infringer's size and financial condition;
5. Closeness of the case;
6. Duration of the infringer's misconduct;
7. Remedial action by the infringer;
8. The infringer's motivation for harm; and
9. Whether the infringer attempted to conceal its misconduct.
970 F.2d 816, 827 (Fed. Cir. 1992) ; see WBIP, LLC v. Kohler Co. , 829 F.3d 1317 (Fed. Cir. 2016) (post- Halo , affirming the lower court's grant of enhanced damages after applying the Read factors). Consideration or discussion of these nine factors, however, is not mandatory. See Presidio Components, Inc. v. Am. Tech. Ceramics Corp. , 875 F.3d 1369, 1382 (Fed. Cir. 2017) (stating that "the district court is not required to discuss the Read factors").
In this case, Plaintiff moves for enhanced damages to the full extent allowed under Section 284, which is treble damages. Plaintiff frames its motion around the Read factors and argues that all nine factors strongly favor enhanced damages. Defendants argue just the opposite.
The Court has reviewed the record in this case and has considered the Read factors as general guidance in its determination on enhanced damages. The touchstone for the Court's determination, *1362 however, remains the extent to which Defendants engaged in "egregious infringement behavior." Halo , 136 S.Ct. at 1932.
A. Factor One: Copying
Plaintiff contends that the evidence shows Defendant GPI deliberately copied Plaintiff's toner bottles when making Type A bottles and later used the same measurements-derived from the Type A copying exercise-when making Type B bottles. Defendants argue that Type A was GPI's own invention and that Plaintiff did not inform Defendants about its '012 patent application prosecution activity when GPI was openly selling Type A bottles (i.e., before the '012 patent issued). And as to Type B, Defendants argue that it is also GPI's own invention, and they once again highlight that GPI designed Type B before the '012 patent issued.
The Court first addresses Defendants' argument that they developed Type A and Type B bottles before the '012 patent issued, thus demonstrating that they were not copying the patent and were instead trying to develop a competitive alternative to Plaintiff's bottles. The first Read factor does not focus on whether Defendants copied the '012 patent itself, but whether they copied the "ideas or design" of Plaintiff's bottles-which could have occurred before the '012 patent issued. See e.g., Barry v. Medtronic, Inc. , 250 F.Supp.3d 107, 112 (E.D. Tex. 2017) ("The copying inquiry under Read focuses not on whether Medtronic copied Dr. Barry's patent but whether it copied 'the ideas or design of another,' regardless of when Dr. Barry's patents might have issued."); WBIP, LLC v. Kohler Co. , No. CIV.A. 11-10374-NMG, 2014 WL 585854, at *7 (D. Mass. Feb. 12, 2014), aff'd, WBIP, LLC v. Kohler Co. , 829 F.3d 1317, 1342 (Fed. Cir. 2016) ; Stryker Corp. v. Zimmer, Inc. , No. 1:10-CV-1223, 2017 WL 4286412, at *4 (W.D. Mich. July 12, 2017). Accordingly, Defendants' conduct before as well as after the '012 patent issued may be probative for this factor.[1]
The Court now examines the parties' arguments with respect to Type A and Type B bottles separately.
As to Type A, the evidence shows GPI obtained Canon Set On III toner bottles, disassembled them, measured them, determined their structure, and then used that information to make the Type A bottles in 2005. (Trial Transcript at 618-25.) Defendants do not present persuasive evidence that GPI made design-around changes to the Type A bottle.
For instance, Mr. Li, one of GPI's employees who oversaw the development of the infringing bottles in this case, testified that Type A had some "dimensional issues" when it fit into the copier machine and some gaps between the bottle body and the upper cap. (Trial Transcript at 1129-31.) Defendants cite to these "issues" as evidence that GPI could not have copied Canon's toner bottles, since Canon's bottles were supposed to be the ideal standard. However, Mr. Li does not describe any specific adjustments or changes his team made to the Type A that made it *1363 different from Canon's bottles. He only generally says he made "some changes." (Trial Transcript at 1128.) Compare with Read , 970 F.2d at 828 (not finding copying where the defendant used the patented invention as a "starting point" for design-around efforts and also "made specific changes deemed adequate by counsel to avoid infringement of both of Read's patents"). The fact that GPI manufactured Type A bottles in a way that still resulted in some "issues" does not automatically mean GPI did not engage in copying; it could simply mean that GPI encountered flaws in its manufacturing process, for example. Moreover, Mr. Hsu, GPI's vice president of sales, agreed that the cap or sealing member of the Type A bottles and the Canon bottles appear "pretty much the same" with only "minor differences." (Trial Transcript at 574-75.)
Defendants' Type B bottles are a different story. While the jury had sufficient evidence to find that Type B bottles were infringing, Defendants also presented evidence of noticeable changes they made to Type B bottles when compared to Canon's bottles. Mr. Li testified that he designed around the Canon bottles by using a "different [ ] operating principle and designed a part that looks like a duckbill" instead of the engaging projections in Canon bottles. (Trial Transcript at 1135.) He stated that "my thinking was that if I could avoid using the engaging projections I would be able to design around most of the Canon patents." (Id. at 1138-39.)
Defendants further emphasize that they applied for and obtained a patent, the '910 patent, which they argue covers their Type B bottles. Defendants applied for the patent on January 31, 2011, after they had started manufacturing and selling the Type B bottles. The Court precluded Defendants from introducing the actual '910 patent or patent application into evidence, as such evidence "is not relevant to a determination of whether or not Defendants infringed the '012 patent" and moreover might confuse the jury. (Doc. 533 at 6.) But the Court also ruled that such evidence "could potentially be relevant to the issue of willful infringement." (Id. at 3, 6-7.) Accordingly, the Court has reviewed the '910 patent (Doc. 498-5),[2] and without making an legal or factual conclusions about whether it covers Type B bottles, the Court finds the patent to be indicative of Defendants' intent to not copy Canon's bottles when making their Type B bottles. Arguably, Defendants would not have applied for the '910 patent if they did not believe they had successfully designed around Plaintiff's '012 patent. Indeed, Defendants do not make this same argument with respect to Type A bottles, which is telling. The '910 patent is not conclusive evidence either way, particularly given that Defendants applied for it after they had already sold the infringing Type B bottles. But it is additional evidence, along with Mr. Li's testimony and the Type B bottle design itself, suggesting that Defendants did not deliberately copy when making the Type B bottles.
*1364 Thus, this first factor weighs slightly in favor of enhanced damages. The evidence suggests deliberate copying as to Type A bottles but not as to Type B bottles, which made up the majority of the infringing sales at issue in this case.
B. Factor Two: Investigation into the Patent
The second factor considers "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." Read , 970 F.2d at 827.
Based on the evidence in this case, this second factor tracks the first factor. Defendants do not appear to have formed a good-faith belief of non-infringement with respect to their Type A bottles, but they appear to have done so with respect to their Type B bottles. There is simply no evidence that, after learning of the '012 patent in January 2010, Defendants investigated or even discussed whether Type A bottles infringed the patent. Defendants point to the testimony of Mr. Hsu, the vice president of GPI's sales, when asked how GPI determined Type A bottles did not infringe. Mr. Hsu stated, "During the process of research, my engineer reported to me that there was no infringement for the patents. It is matched with the machine." (Trial Transcript at 972.) He explained that "matched with the machine" means no infringement because when customers buy the OEM machine (i.e., the Canon copier), they own the machine and therefore have a choice of buying Canon toner bottles or GPI's after-market toner bottles. (Id. at 980-81.) This discussion between Mr. Hsu and his engineer occurred "during the process of research" about Type A bottles, which would have occurred around 2005 when Type A bottles were first manufactured. Defendants present no evidence of discussions about Type A bottles' infringement at a later date, particularly after learning of the '012 patent-which is the relevant time frame for this second factor.
Furthermore, Ms. Hsieh, GPI's patent specialist, contradicted Mr. Hsu's testimony regarding pre-patent discussions; she testified that she was not aware of anyone else at GPI, including Mr. Hsu and Mr. Li, forming beliefs about whether the '012 patent covered Type A bottles. (Trial Transcript at 1100.) Rather, the evidence shows that Defendants learned of the patent in January 2010, continued to sell Type A bottles for approximately one year after that point, and meanwhile, conducted no new investigations or made any determinations regarding whether Type A bottles infringed or not. Thus, there is insufficient evidence here to support a good-faith belief of non-infringement by Defendants about their Type A bottles.
In contrast, the record supports Defendants' good-faith belief with respect to their Type B bottles. For one, Defendants point to a meeting on April 20, 2010-within months of learning about the '012 patent-regarding "patent circumvention" for their Type B bottles. (Doc. 633-35 at 38-40) (Trial Transcript at 1159-1161.) Mr. Li attended the meeting, and he describes box 18 of the meeting minutes as distinguishing between Type B bottles and the '012 patent based on Type B bottles lacking an engaging projection. (Trial Transcript at 1160.) He testified that the "operating principles" of the Type B bottles were not contained in the '012 patent, or any other Canon patents, noted in box 18 of the meeting minutes. (Id. at 1161.) Additionally, Mr. Li described a document titled "Order for New Development" and dated March 9, 2011, in which GPI noted that it had a "patent strategy" with respect to Type B bottles. (Doc. 633-35 at 66.) Mr. Li explained that this document "indicated that we have a patent countermeasure" or a "design-around design" for *1365 Type B. (Trial Transcript at 1076.) More specifically, Mr. Li stated that he redesigned the Type B bottles shortly after GPI learned of the '012 patent, by introducing a curved surface on the duckbill part "to ensure better driving and make it harder to be deformed." (Id. at 1155-58.) Before redesigning Type B, Mr. Li stated that he "searched through all the patents we knew at the time." (Id. at 1158.)
The Court therefore finds sufficient evidence that Defendants formed a good-faith belief that their Type B bottles were non-infringing, design-around products. This good-faith evidence about Type B stands in stark contrast to the lack of good-faith evidence about Type A. Based on the Court's findings as to Type A bottles alone, this second factor weighs slightly in favor of enhanced damages.
C. Factor Three: Infringer's Litigation Conduct
The third Read factor examines whether the infringer engaged in litigation misconduct, which refers to "bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." i4i Ltd. P'ship v. Microsoft Corp. , 598 F.3d 831, 859 (Fed. Cir. 2010), aff'd , 564 U.S. 91, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011).
The Court finds that this factor does not weigh for or against enhancement. Both sides fought hard during litigation-at times almost stepping over the line, though not quite. For instance, Plaintiff takes issue with Defendants raising new defenses of exhaustion, implied license, and repair on an untimely basis after claim construction. However, as the Court stated in its July 1, 2016 Order, Plaintiff was on notice that these were possible defenses as early as January 9, 2014, the date of the claim construction order finding a combined patent construction. The Court then extended fact discovery in light of the claim construction ruling, and at the end of discovery, the Court allowed Defendants to amend their answers to add these three defenses based on Plaintiff's prior notice. (See Doc. 431 at 2 n.1.) Plaintiff points to Defendants' representations that it had a good-faith belief of non-infringement all along based on exhaustion, and therefore Plaintiff argues Defendants should have raised the defense much earlier.
In the same July 1, 2016 Order referenced above, the Court found that Plaintiff was attempting to get expert testimony in through its new Rule 30(b)(6) witness, Mr. Fujino, and on subject matter that the prior 30(b)(6) witness did not testify about. (Id. at 4.) The Court limited Mr. Fujino's testimony to the scope of the prior witness's testimony and also granted Defendants' motion to exclude Plaintiff's new documents. In this way, Plaintiff employed some of the same questionable tactics it accuses Defendants of using.
This is not to say that Defendants' litigation conduct was straight arrow. Defendants unquestionably shifted their theories on the eve of trial and even during trial. For instance, the Court had to preclude Defendants' expert from opining on a brand new theory, the reverse doctrine of equivalents theory, which Defendants raised for the first time just days before trial. (See Doc. 604.) But based on the evidence and the Court's experience with both sides over several years, the Court finds that Defendants' conduct does not rise to the level of egregiousness that warrants enhanced damages. See, e.g., Barry , 250 F.Supp.3d at 117 ("Enhancement analysis is not an opportunity for this court to penalize a zealous trial team that engaged in hard-fought battles but ultimately lost the war. Neither party here refrained from delivering hard blows or from attempts to hide the ball."); compare with *1366 Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co. , 203 F.Supp.3d 755, 763 (E.D. Tex. 2016) (finding litigation misconduct where defendants "made multiple material misrepresentations under oath," "failed to produce relevant documents," and were sanctioned at trial); compare with WBIP , 2014 WL 585854, at *7 (finding litigation misconduct where "Kohler had a third party designate documents 'for outside attorneys' eyes only' thus prohibiting WBIP's expert from viewing them and then subsequently argued that the expert's opinion was unreliable because he did not address those 'key' documents"). This factor is neutral.
D. Factor Four: Infringer's Size and Financial Condition
This factor considers an infringer's size and financial condition "relative to the plaintiff and also individually to ensure that enhanced damages would not unduly prejudice the defendant's non-infringing business." Krippelz v. Ford Motor Co. , 670 F.Supp.2d 815, 822 (N.D. Ill. 2009).
GPI is considerably smaller in size than Plaintiff by almost any measure.[3] From January 12, 2010 to December 31, 2013, GPI's U.S. sales for all its products was approximately $90 million, and its U.S. gross profits for all its products was approximately $40 million.[4] Plaintiff's overall profits during the same period, for its Set On II products alone , was $249 million. Though GPI is not meager in size, it still appears that enhanced damages-in addition to the over $4.2 million in compensatory damages-could materially impact GPI's business. The purpose of awarding enhanced damages is to punish a defendant's willful infringement that is egregious in nature, but it is not to unduly prejudice or destroy a defendant. Krippelz , 670 F.Supp.2d at 822 ; Read , 970 F.2d at 827 (when discussing this factor, citing to case law with the following parenthetical: "Exemplary damages should not unduly prejudice the defendants' non-infringing business.") (internal quotations omitted). This case is in a different factual posture than cases where the fourth factor favored enhancement because the defendant was "a much larger company" than the plaintiff and was "unquestionably large enough and profitable enough to pay enhanced damages." WBIP , 829 F.3d at 1341 ; z4 Techs., Inc. v. Microsoft Corp. , No. 6:06-CV-142, 2006 WL 2401099, at *26 (E.D. Tex. Aug. 18, 2006).
Accordingly, the Court concludes that this factor is neutral with respect to enhancement.
E. Factor Five: Closeness of Case
As discussed above in factor three, the Court finds that this case was hard fought and relatively close. Though the jury returned a verdict in favor of Plaintiff, Defendants' defenses were not frivolous or completely without merit. Even in the Court's Order denying Defendants' motions for judgment as a matter of law and for a new trial, the Court made a point of noting that "[t]he exhaustion defense and its relationship to the repair defense were difficult issues" and that "case law is sparse on [the] three particular defenses." (Doc. 685 at 4.) This fifth factor therefore disfavors enhanced damages.
F. Factor Six: Duration of Misconduct
The sixth factor "looks at the duration of the infringer's misconduct" or the *1367 "duration of infringement" when the defendant had knowledge of the patent. I-Flow Corp. v. Apex Med. Techs., Inc. , No. 07CV1200 DMS (NLS), 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) ; Broadcom Corp. v. Qualcomm Inc. , No. SACV 05 467 JVS RNBX, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) (vacated on other grounds). This factor and factor seven are often considered collectively. The Court first looks at the duration issue for this sixth factor.
After the '012 patent issued in January 2010 and Defendants learned of it shortly thereafter, Defendants continued to sell Type A bottles for over a year. (Trial Transcript at 1027-1030.) They continued to sell Type B bottles after Plaintiff filed the instant suit on September 15, 2011, and up through September 2, 2015, when they entered into a consent order with Plaintiff before the International Trade Commission ("ITC"). (Id. at 594-95; ITC Consent Order, Doc. 644-5.) This evidence weighs in favor of enhanced damages for factor six. See, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC , No. 511CV761GLSDEP, 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016) ("[C]ontinuing to sell the infringing products after notice of infringement and during the course of litigation supports enhancement."); Broadcom , 2007 WL 2326838, at *3 ("The length of Qualcomm's infringement (approximately two years), coupled with the fact that infringement continued after Broadcom filed its suit, supports an increase in damages.").[5]
G. Factor Seven: Remedial Action
The seventh factor considers whether the infringer remedied some of its infringement, such as "whether the defendant ceased the sale of the infringing product during the pendency of the litigation," Creative Internet Advert. Corp. v. Yahoo! Inc. , 689 F.Supp.2d 858, 869 (E.D. Tex. 2010), or whether the defendant "shows an effort to design around the [ ] patent." Apple Inc. v. Samsung Electronics Co., Ltd. , 258 F.Supp.3d 1013, 1035 (N.D.Cal. 2017).
Defendants argue that they took remedial steps by reducing sales of Type A after learning of the '012 patent, and that they implemented a "pre-patent design-around Type B to replace Type A" so as to avoid infringing "Canon's whole patent family." (Doc. 644 at 22.) Defendants' decision to voluntarily stop selling Type A bottles after learning of the '012 patent-albeit over a year later-may be considered *1368 a small remedial step. See Read , 970 F.2d at 827 (noting the voluntary withdrawal of the infringing product from the market during the pendency of litigation as an example of remedial action). But ultimately, Defendants' continued sales of infringing Type B bottles for several years-and their decision to stop selling only when confronted with an ITC investigation-cannibalize Defendants' limited remedial effect in connection with their sales of the Type A bottles.
As to Defendants' "pre-patent design-around" argument for Type B bottles, Defendants cannot logically argue that, by creating Type B bottles in 2008, they designed around the '012 patent before it ever existed. Defendants' good-faith non-infringement beliefs before the '012 patent issued only get them so far; for this seventh factor, the Court looks to the steps that Defendants took after they learned of the patent and their potential infringement of it. Defendants do not even attempt to argue or point to evidence that they made design-around modifications to Type B after learning of the patent.
Additionally, Defendants' argument about Plaintiff's failure to seek a preliminary injunction in this case is unavailing. Plaintiff rightly points out that it does not seek damages based solely on Defendants' conduct after this case was filed; therefore, Plaintiff was not required to file a preliminary injunction to establish willfulness and later move for enhanced damages. See Mentor Graphics Corp. v. EVE-USA, Inc. , 851 F.3d 1275, 1296 (Fed. Cir. 2017) ("[T]here is no rigid rule that a patentee must seek a preliminary injunction in order to seek enhanced damages.") (internal quotations omitted); compare with Radware , 2016 WL 4427490, at *6.
Viewing the remediation evidence altogether, the Court finds that Defendants did not timely endeavor to remedy their infringement of the '012 patent. This factor favors enhanced damages.
H. Factor Eight: Motivation for Harm
For the eighth factor, the Court considers whether there is evidence of any direct motivation on the part of the infringer to harm the patent holder, as opposed to advancing its own interests. z4 Techs., Inc. v. Microsoft Corp. , No. 6:06-CV-142, 2006 WL 2401099, at *26 (E.D. Tex. Aug. 18, 2006) ; I-Flow Corp. v. Apex Med. Techs., Inc. , No. 07CV1200 DMS (NLS), 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010).
Plaintiff merely points to evidence that Defendants sold their toner bottles to compete with Plaintiff's toner bottles. Plaintiff does not show, for instance, that Defendants "used a copied design in order to avoid using a less desirable alternative," Apple , 258 F.Supp.3d at 1036, or "preferred taking the risk of infringement over designing a non-infringing device." Polara Eng'g, Inc. v. Campbell Co. , 237 F.Supp.3d 956, 994 (C.D. Cal. 2017). Thus, Plaintiff's evidence does not show Defendants' had a motivation to harm on the scale of egregiousness. See, e.g., Georgetown Rail Equip. Co. v. Holland L.P. , No. 6:13-CV-366, 2016 WL 3346084, at *20 (E.D. Tex. June 16, 2016), aff'd, 867 F.3d 1229 (Fed. Cir. 2017) (finding this factor neutral, where "there is nothing to suggest that Holland acted out of spite or ill-will toward Georgetown or for any reason other than a desire to capture a piece of the market"); Barry , 250 F.Supp.3d at 116-17 (finding this factor neutral based on "no evidence that Medtronic was motivated to infringe or continue infringing for any reason other than its own commercial business interest"); compare with Polara Eng'g, Inc. v. Campbell Co. , 237 F.Supp.3d 956, 994 (C.D. Cal. 2017) (finding this factor favored enhancement, where the parties were "direct competitors in a relatively small market"
*1369 and "the evidence supports the conclusion that Campbell preferred taking the risk of infringement over designing a non-infringing device, and that Campbell did so to divert business from Polara"). This factor is neutral.
I. Factor Nine: Attempt to Conceal
The final factor looks to whether the infringer attempted to conceal its infringing activity, such as failing to preserve its records or avoiding certain advertising that would tip off the patent holder. See Read , 970 F.2d at 827 ; Applera Corp. v. MJ Research Inc. , 372 F.Supp.2d 233, 246 (D. Conn. 2005).
There is at least one piece of evidence that suggests Defendants attempted to conceal their infringement. Mr. Hsu testified that, after Canon sued Densigraphix, one of GPI's customers told GPI that it did not want to sell Type A bottles anymore in the United States. (Trial Transcript at 599.) GPI then told the customer that it should continue to sell Type A bottles "without any high profile advertising," and that there would be "severe consequences, including possibly canceling the business relationship," if the customer did not sell the Type A bottles. (Id. at 600-601.) Though Plaintiff knew about the Type A bottles already at this point, based on its lawsuit against Densigraphix, that is irrelevant for this factor-which focuses solely on whether Defendants attempted to conceal their infringement, not whether they successfully did so. Read , 970 F.2d at 827.
This factor slightly favors enhancement based on the slim record indicating concealment. Compare with PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC , No. 511CV761GLSDEP, 2016 WL 6537977, at *4 (N.D.N.Y. Nov. 3, 2016) (finding this factor strongly favors enhancement where defendant redesigned a product by adding features previously found to infringe and then deceived the patent holder by saying the new features were "invisible").
Overall, as a summary of the Read factors, the Court finds that factors six and seven favor enhancement; factors one, two, and nine slightly favor enhancement; factors three, four, and eight are neutral; and factor five disfavors enhancement.
III. Conclusion
Upon weighing the totality of the evidence, and in light of the Read factors and the Supreme Court's recent Halo decision, the Court concludes that Plaintiff is entitled to a modest enhancement of damages by 20%. This case does not rise to the level of egregiousness that warrants treble damages, but instead presents a lesser degree of egregiousness consistent with precedent. See, e.g., Barry , 250 F.Supp.3d at 119 (awarding 20% enhanced damages where only four out of nine Read factors favored it); Virginia Panel Corp. v. MAC Panel Co. , 133 F.3d 860, 867 (Fed. Cir. 1997) (upholding decision to award 10% enhanced damages where the lower court emphasized that "many of the issues in this case were close questions" and that "a large enhancement of damages could drive [the infringer] out of business"); Apple , 258 F.Supp.3d at 1036 (awarding 30% enhanced damages where three factors favored enhancement, one slightly favored, one was neutral, two weighed slightly against, and two weighed against).
The Court therefore GRANTS Plaintiff's Motion [Doc. 644] consistent with the discussion herein and awards Plaintiff 20% enhanced damages.
IT IS SO ORDERED this 22nd day of February, 2018.

To the extent Defendants rely on Radware, Ltd. v. F5 Networks, Inc. , for the opposite conclusion, the Radware decision is distinguishable. No. 5:13-CV-02024-RMW, 2016 WL 4427490, at *6 (N.D. Cal. Aug. 22, 2016). When discussing the copying factor, the court mentioned that the infringing product was developed "10 years" before the plaintiff's patent issued. Id. But the court did not rely on this fact alone when concluding that the copying factor weighed in favor of the defendant. The court emphasized that the plaintiff presented no evidence that the defendant copied its design or source code (as opposed to the patent itself), and that there was no evidence that the defendant ever possessed the patented invention before releasing its own product. Thus, this case does not state that a defendant's pre-patent activities are not probative for the copying factor.

The '910 patent includes an embodiment that appears to have a "duckbill" sealing member. The Court does not make a finding as to whether the '910 patent's claims actually cover Type B bottles, but the embodiment suggests that Defendants intended for the '910 patent to cover Type B bottles. Furthermore, the '910 patent references Canon's '012 patent as prior art, and the U.S. Patent and Trademark Office authorized issuance of the '910 patent on April 16, 2013. While the Court makes no findings as to the validity of the '910 patent, the fact that it references the '012 patent as prior art suggests that Defendants were not trying to mislead the U.S. Patent and Trademark Office when applying for the '910 patent and that they had a good-faith belief that their Type B bottle design constituted a new invention.

The Court does not consider the size of Color Imaging for this factor, as Color Imaging and GPI announced in the news that GPI agreed to indemnify Color Imaging for all potential liability and costs arising from this case. (See Doc. 644-4.)

The Court uses the conversion rate as of the date of this Order to convert Defendants' sales and profits from New Taiwan Dollar amounts to U.S. Dollar amounts. (See Doc. 644-3 at 11.)

The Court recognizes an apparent tension between the sixth factor and the second factor (i.e., whether Defendants formed a good-faith non-infringement belief after learning of the '012 patent). In light of Defendants' good-faith non-infringement belief as to their Type B bottles, as discussed above, it is arguably logical why they would continue to sell Type B bottles for several years after learning of Plaintiff's patent. However, a defendant's good-faith belief is merely "one consideration that can color this analysis"; for example, a court may enhance damages more so for a defendant's infringing sales made after a finding of liability compared to sales made before a finding of liability. Milwaukee Elec. Tool Corp. v. Snap-On Inc. , No. 14-CV-1296-JPS, 288 F.Supp.3d 872, 903-04, 2017 WL 6759410, at *21 (E.D. Wis. Dec. 29, 2017) (citing to Read , 970 F.2d at 827 ). However, this good-faith consideration "does not forgive every transgression" when it comes to factor six. Id. (finding factor six favored enhancement despite defendant's argument that it thought its actions were non-infringing). Moreover, courts discussing factor six generally limit their inquiry, focusing on the extent to which Defendants had notice that they might be infringing and could have ceased doing so. See, e.g. , PPC Broadband , 2016 WL 6537977, at *8 ; Creative Internet Advert. Corp. v. Yahoo! Inc. , 689 F.Supp.2d 858, 869 (E.D. Tex. 2010) ; Joyal Prod., Inc. v. Johnson Elec. N. Am., Inc. , No. CIV. A. 04-5172 JAP, 2009 WL 512156, at *8 (D.N.J. Feb. 27, 2009), aff'd , 335 Fed.Appx. 48 (Fed. Cir. 2009).