NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**BOMBARDIER RECREATIONAL PRODUCTS INC., BRP U.S. INC.,**
*Plaintiffs-Appellants*

**v.**

**ARCTIC CAT INC., ARCTIC CAT SALES, INC.,**
*Defendants-Appellees*

---

2018-2388

---

Appeal from the United States District Court for the District of Minnesota in No. 0:12-cv-02706-JRT-LIB, Judge John R. Tunheim.

---

Decided: September 20, 2019

---

KEVIN DONALD CONNEELY, Stinson LLP, Minneapolis, MN, argued for plaintiffs-appellants. Also represented by RUTH RIVARD; ROBERT K. GOETHALS, Leichtman Law PLLC, New York, NY; HARRY C. MARCUS, Locke Lord, LLP, New York, NY; JOSEPH ANTHONY FARCO, Norris McLaughlin, P.A., New York, NY.

NIALL ANDREW MACLEOD, Kutak Rock LLP, Minneapolis, MN, argued for defendants-appellees. Also

represented by AARON MYERS, DIANE PETERSON; JACOB SONG, Irvine, CA; FREDERICK H. DAVIS, Little Rock, AR.

———————————

Before LOURIE, CHEN, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

Bombardier Recreational Products Inc. appeals the district court's denial of judgment as a matter of law or a new trial following a jury trial in a patent infringement case. Because substantial evidence supports the jury verdict that the asserted claims of U.S. Patent No. 7,213,669 are indefinite, and the question of indefiniteness was properly before the jury, we affirm the district court's denial of Bombardier's post-trial motions regarding the '669 patent. In addition, because substantial evidence supports the jury verdict of anticipation and obviousness of the asserted claims of U.S. Patent No. 7,124,847, we likewise affirm the district court's denial of post-trial motions regarding the '847 patent. As the resolution of these issues is dispositive of the validity issues on appeal, we do not reach the parties' remaining arguments.

BACKGROUND

I

In 2011, Bombardier filed suit against Arctic Cat Inc., alleging that Arctic Cat's "Sno Pro Chassis" and "F4 Chassis" snowmobiles infringed certain claims of the '669 and '847 patents. Both the '669 patent and the '847 patent are directed to improvements in the design and construction of snowmobiles.

The '669 patent relates to "a design of a snowmobile that improves the driver's control over the snowmobile and the riders' comfort." '669 patent col. 1 ll. 21–22. To do this, the "snowmobile positions riders close to the center of gravity of the snowmobile, reduc[ing] jostling forces, and improv[ing] the comfort and rideability of the snowmobile."

*Id.* at Abstract. According to the '669 patent specification, conventional snowmobiles seat the driver toward the rear of the snowmobile and away from the center of gravity, causing the driver to feel bumps more acutely. *Id.* at col. 1 ll. 24–39. The invention "improves upon the conventional design by repositioning the riders on the snowmobile . . . to minimize the effect of the snowmobile's movement," which also "facilitates the addition of a third seat for a third rider, who experiences a reasonably comfortable ride." *Id.* at col. 2 ll. 3–9.

Independent claim 88 is at primary issue in this appeal, and recites:

> 88. A snowmobile, comprising:
>
> > a frame;
> >
> > a straddle-type seat disposed on the frame;
> >
> > *a seat position defined by the seat*;
> >
> > an engine disposed on the frame in front of the seat;
> >
> > a drive track disposed below the frame and connected operatively to the engine for propulsion of the snowmobile;
> >
> > a forward-most drive track axle disposed on the frame;
> >
> > two skis disposed on the frame;
> >
> > a steering device having a steering position; and
> >
> > a steering shaft operatively connecting the two skis to the steering device for steering the snowmobile, wherein the steering shaft is disposed over the engine at an angle $\varepsilon$ of less than 45° from vertical and the steering

> position is disposed forward of the forward-
> most drive track axle.

*Id.* at col. 21 ll. 35–51 (emphasis added to disputed claim language).  The other asserted claims—claims 92–95—all depend from claim 88.

The specification describes the term "seat position," noting that "[b]ecause snowmobiles typically have elongated straddle seats and are adapted to permit riders to sit in a variety of front-back positions, numerous seat positions will exist on any straddle seat." *Id.* at col. 5 ll. 39–42.  The specification also expressly defines "seat position," stating: "[t]he inventors of the present invention define the term 'seat position' to point out particular positions on the snowmobile that are adapted to function as the seat position for a standard rider." *Id.* at col. 5 ll. 42–45.  The specification goes on to describe the "standard rider" as follows:

> FIGS. 9A, 9B and 10 illustrate the various dimensions of a standard rider of the type depicted throughout the drawings.  The standard rider is a 50th percentile North-American adult male.  All lengths in FIGS. 9A, 9B and 10 are in centimeters.  The middle of each set of three dimensions represents the standard rider.  The standard rider weighs 78 kgs. and has the body build illustrated in FIGS. 9A, 9B and 10.  The dimensions of the standard rider are a "ruler" by which the dimensions of the various embodiments of the snowmobile of the present invention are measured.

*Id.* at col. 5 ll. 46–55.

## II

Bombardier's second patent, the '847 patent, relates to "the construction of vehicles such as snowmobiles, all terrain vehicles ('ATVs'), and other similar vehicles." '847 patent col. 1 ll. 23–25.  The patent concerns "the construction of a frame and related structural elements that enhance

the ruggedness and ability of such vehicles to operate across a wide variety of different terrains and under a wide variety of conditions." *Id.* at col. 1 ll. 23–29. According to the specification, the structural elements disclosed in the '847 patent permit the vehicle to be converted from a snowmobile in the winter to an ATV in the summer, without "suffer[ing] from drawbacks that are associated with the purpose for which the primary vehicle was designed." *Id.* at col. 2 ll. 26–38. This appeal concerns claims 1, 6, 7 and 8, which read as follows:

1. A snowmobile, comprising:

   a frame including a tunnel and an engine cradle forward of the tunnel;

   an engine mounted in the engine cradle;

   a drive track disposed below and supported by the tunnel and connected operatively to the engine for propulsion of the snowmobile;

   left and right skis disposed on the frame;

   a straddle seat disposed on the tunnel above the drive track and rearward of the engine;

   a pair of footrests supported by the frame;

   a steering column movably connected to the frame other than via a head tube and operatively connected to the two skis;

   a handlebar connected to the steering column;

   a *pyramidal brace assembly* connected to the frame, the assembly including:

   left and right rear legs extending forwardly and upwardly from the

tunnel, each of the left and right rear legs having a front end and a rear end, the rear ends of the rear legs being spaced further from each other than the front ends of the rear legs, and

left and right front legs extending rearwardly and upwardly from the frame forward of the tunnel, each of the left and right front legs having a front end and rear end, the front ends of the front legs being spaced further from each other than the rear ends of the front legs.

6.  The snowmobile of claim 1, wherein the rear ends of the front legs of the pyramidal brace assembly and the front ends of the rear legs of the pyramidal brace assembly are interconnected and form an apex not forward of the engine.

7.  The snowmobile of claim 6, further comprising an *upper column extending upwardly from the frame*.

8.  The snowmobile of claim 7, wherein the *upper column forms the apex* with the front ends of the rear legs of the pyramidal brace assembly and the rear ends of the front legs of the pyramidal brace assembly.

*Id.* at col. 14 l. 41–col. 15 l. 3; col. 15 ll. 17–26 (emphases added to highlight disputed claim terms).

Figure 28, below, depicts an embodiment of the invention as recited in claim 8. As shown, the left and right rear legs (122, 124) form a pyramidal assembly with the left and right front legs (138, 140) and the upper column (118). *See id.* at col. 12 ll. 46–53.



*Id.* Fig. 28 (annotated). The legs and the upper column connect to the steering bracket (374) at the apex of the pyramidal brace assembly (372). *Id.* at col. 12 ll. 46–48.

### III

Nearly four years after the lawsuit commenced, the district court issued its claim construction order interpreting several claim terms in the '669 and '847 patents. Relevant here, the district court construed the terms "seat position defined by the seat" in the '669 patent and "pyramidal brace assembly," "apex," and "upper column" in the '847 patent.

First, the district court construed "seat position defined by the seat" in independent claim 88 of the '669 patent. The district court adopted in large part the definition of "seat position" identified in the specification and proposed by Bombardier.  The district court emphasized that the specification defines "seat position[s]" as "particular positions on the snowmobile that are adapted to function as the seat position for a standard rider." *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, No. 12-cv-02706, slip op. at 31–32 (D. Minn. Sept. 28, 2015) (citing '669 patent col. 5 ll. 36–45).  Finding that Bombardier's "proposed construction did not include the entire definition included in the specification," however, the district court further incorporated the specification's disclosed dimensions for the "standard rider." *Id.* at 34.  The district court also included Bombardier's proposed language that the rider be seated in a "natural operating position," finding support for this requirement in Bombardier's provisional application. *Id.* at 35–36.  Accordingly, the district court's ultimate construction of "seat position defined by the seat" was "a portion of the straddle-type seat positioned beneath the center of weight distribution of a 50th percentile North-American adult male weighing 78 kg and has [*sic*] the body build illustrated in FIGS. 9A, 9B and 10 seated in a natural operating position." *Id.*

Next, the district court adopted Arctic Cat's proposed construction of "pyramidal brace assembly" in claim 1 of the '847 patent.  Focusing on the plain and ordinary meaning of "pyramidal," the court held that "pyramidal brace assembly" requires "a brace assembly with a pyramid-like shape connected to the frame." *Id.* at 9–14.  The district court likewise construed "apex" in claims 6 and 8 of the '847 patent consistent with Bombardier's proposed construction to require "the uppermost part of the pyramidal brace assembly." *Id.* at 15.  The district court adopted the parties' agreed-upon construction of "upper column" in claims 7 and 8 of the '847 patent to require "an inverted U-shaped

structure forming legs extending upwardly from the left and right sides of the frame." *Id.* at 15–17. The district court rejected Bombardier's added requirement, however, that the upper column be "intermediate the pairs of rear and front legs," finding that this addition had no support in the specification or the claims. *Id.*

Following claim construction, Bombardier and Arctic Cat filed cross-motions for summary judgment. The district court granted partial summary judgment to Bombardier, holding that Arctic Cat's "Sno Pro Chassis" and "F4 Chassis" infringed claims 1 and 6–8 of the '847 patent as a matter of law. The district court denied partial summary judgment of invalidity to Arctic Cat, holding that it could not determine whether the term "seat position defined by the seat" in claim 88 of the '669 patent was indefinite because Arctic Cat had focused its indefiniteness argument on the ambiguity of the court's construction, not on the term as used in the patent.

IV

A three-week jury trial began in November 2017. Arctic Cat presented evidence of invalidity of the asserted claims of both the '669 and '847 patents.

A

With respect to the '669 patent, Arctic Cat attempted to elicit testimony from its expert regarding the indefiniteness of the term "seat position defined by the seat." The district court ruled that it was improper "to present to the jury evidence [that] the claim as construed by the [c]ourt is indefinite." J.A. 3657. Arctic Cat then pivoted to arguing non-enablement, asserting that "the full scope of the claimed invention is not described well enough for the person of skill in the art to make the invention." J.A. 3659. Arctic Cat's expert highlighted "dozens and dozens of errors" in Figures 9A, 9B and 10, including that the total height disclosed in the figures and the sum of the sub-

dimensions for height were inexplicably unequal.   J.A. 3660–61.  Arctic Cat's expert explained that a person of ordinary skill in the art would not have known whether the overall height was wrong, or whether the sub-dimensions were wrong.  J.A. 3661.  Arctic Cat's expert similarly highlighted errors in the ground to lower arm, head depth, ground to ankle, and arm length measurements of the figures, concluding that it would be "nearly impossible" to "build a custom dummy with the dimensions in Figures 9A, 9B and 10."  J.A. 3661–62; *see also* J.A. 22709–25.  Noting that the '669 patent specification describes the dimensions of the standard rider as a "ruler," Arctic Cat's expert succinctly summarized his testimony as "this ruler is broken." J.A. 3660.

Arctic Cat also addressed the district court's use of the term "natural operating position" in its construction of "seat position defined by the seat."  Arctic Cat's expert testified that "there is no such thing as a natural operating position." J.A. 3663.  He explained that "[s]nowmobiles are a dynamic activity" requiring lots of movement and different positions.  *Id.*  He also noted that the figures in the '669 patent contain several different operating positions. *Id.*

Bombardier countered Arctic Cat's expert with expert testimony of its own.  Using a 50th percentile adult male test dummy, Bombardier's expert physically demonstrated how a person of ordinary skill in the art would have determined the "seat position" on a snowmobile.  Bombardier's expert also testified that a person of ordinary skill in the art would have known the relevant sub-dimensions in designing a snowmobile for a 50th percentile male, and that those sub-dimensions were correct in Figures 9A, 9B and 10.  Referencing the depictions of snowmobile riders in the figures of the '669 patent, Bombardier's expert described the "natural operating position" as "a position with the wrists neutral, elbows slightly flexed and the torso slightly forward . . . [in a] position that allows the rider to control

the vehicle and be comfortable over a long period of time." J.A. 2067–68.

B

Turning to the '847 patent, Arctic Cat presented evidence that two prior art snowmobiles, the "T/S Mod" and the "Blade," anticipated claims 1 and 6 and rendered obvious claims 7 and 8. The jury viewed physical models of both snowmobiles. Referencing a photograph of the T/S Mod, Arctic Cat's expert described how the T/S Mod disclosed each element of claim 1, including that the "front legs and the rear legs converge" in a "pyramidal brace assembly." J.A. 3465–66. Arctic Cat's expert also described how the T/S Mod met claim 6's limitation that the "legs of the pyramidal brace assembly are interconnected and form an apex." He demonstrated the location of the "apex" on the T/S Mod by drawing a circle on the photograph around the uppermost portion of the pyramidal assembly as depicted below.



J.A. 22031 (annotated).

With respect to the "upper column" limitation in claims 7 and 8 of the '847 patent, Arctic Cat's expert testified that upper columns were commonplace in the industry

and that they functioned to support the steering column and the handlebars. J.A. 3536–37. Arctic Cat's expert also testified that the '847 patent itself discloses an upper column in its depiction of the prior art in Figure 4. J.A. 3467–68. The '847 patent describes the prior art as including "an inverted U-shaped structure that extends upwardly from the combined engine cradle and tunnel," which in combination with a bracket "provides structural support for [the] handlebars, which [are] used to steer [the] snowmobile." '847 patent col. 7 ll. 24–29.

Arctic Cat's expert also testified that the Blade snowmobile disclosed an "upper column." J.A. 3469. According to the expert, the Blade's "delta perimeter frame" includes "front legs" and "rear legs" that converge in a "trapezoidal" shape with the "upper column." J.A. 3493; *see also* J.A. 3473–74. He explained that the purpose of the overall design is "to add structural stiffness, torsional stiffness, [and] vertical stiffness . . . across the framework." J.A. 3474.

Arctic Cat's expert finally addressed whether a person of ordinary skill in the art would have been motivated to combine the "pyramidal brace assembly" limitation disclosed in T/S Mod with the "upper column" in Blade and the prior art description in the '847 patent. The expert stated that "[p]erhaps if he didn't find enough strength in his design, he might decide to throw an upper column in there as well as an added measure." J.A. 3501. On cross-examination, Arctic Cat's expert admitted that he did not "know what [the] motivation might be" to add an upper column if the steering column was already adequately supported by the pyramidal brace assembly, given that "in designing these sleds you want to keep them as lightweight as possible." J.A. 3537.

V

The jury returned its verdict on December 6, 2017. The jury found that Arctic Cat infringed claims 88 and 92–95 of

the '669 patent, but that these claims were invalid on the grounds of indefiniteness and anticipation. The jury also found that claims 1 and 6–8 of the '847 patent were invalid on the grounds of anticipation and obviousness. The district court denied the parties' respective motions for JMOL, upholding the jury verdict in all respects. In particular, the district court held that substantial evidence supported the jury's determination that claims 88 and 92–95 of the '669 patent were indefinite. The district court highlighted Arctic Cat's evidence that the errors in the patent's figures would make it difficult for a person of ordinary skill in the art to determine the dimensions of the standard rider. Because the inventors had incorporated the dimensions of the standard rider into the definition of "seat position defined by the seat," the district court held that this evidence supported the jury's finding of indefiniteness. Alternatively, the district court held that Arctic Cat's evidence that a person of ordinary skill in the art would not have understood the meaning of "natural operating position" provided an independent ground for indefiniteness. The district court likewise held that substantial evidence supported the jury's determination that the asserted prior art disclosed the "apex" and "upper column" limitations in the asserted claims of the '847 patent.

Bombardier appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review the grant or denial of JMOL according to the law of the regional circuit. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1323–24 (Fed. Cir. 2008). The Eighth Circuit "reviews de novo the district court's decision to deny judgment as a matter of law." *Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1064 (8th Cir. 2008). In reviewing a denial of JMOL, we must consider "all the evidence in the record without weighing credibility, while resolving conflicts and making all reasonable inferences in favor of the

non-moving party." *Id.* at 1064–65.  We may not set aside the jury verdict "unless there is a complete absence of probative facts to support the verdict and only speculation supports the verdict." *Id.* at 1065 (citation omitted).

On appeal, Bombardier argues that: (1) the term "seat position defined by the seat" in claims 88 and 92–95 of the '669 patent is not indefinite as a matter of law; (2) claim 6 of the '847 patent was not anticipated by the T/S Mod snowmobile as a matter of law; and (3) claims 7 and 8 of the '847 patent would not have been obvious over the asserted prior art as a matter of law.  We address each issue in turn.

I

We begin by addressing indefiniteness of the term "seat position defined by the seat."  We typically "review indefiniteness determinations de novo except for necessary subsidiary fact findings." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018).  When an issue of law has been submitted to the jury upon disputed facts, "we first presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence." *Jurgens v. McKasy*, 927 F.2d 1552, 1557 (Fed. Cir. 1991).  We then "examine the legal conclusion de novo to see whether it is correct in light of the presumed jury fact findings." *Id.*  A "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

As an initial matter, Bombardier argues that the question of indefiniteness should have been before the court and not the jury.  We have held that indefiniteness "is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Haliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003).  We have likewise

held that a "question about the state of the knowledge of a skilled artisan is a question of fact." *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015).   Here, the primary disputes are: (1) whether a person of ordinary skill in the art would have understood how to design a "seat position" for a standard rider despite the errors in the dimensions provided in the specification; and (2) whether a person of ordinary skill in the art would have known how to place a dummy or rider in a "natural operating position" on a snowmobile.  The evidence presented on these topics was almost exclusively extrinsic, in large part encompassing warring expert testimony.  The question of definiteness thus required the resolution of critical factual issues and was properly before the jury.

We note that neither the term "natural operating position" nor the references to Figures 9A, 9B and 10—the language the district court determined supported the jury's finding of indefiniteness—appear in the claim.  This language comes instead from the district court's unchallenged construction of the claim term "seat position defined by the seat," a construction driven by Bombardier's choice to act as its own lexicographer in this instance.  Here, where neither party challenges the district court's construction on appeal, it is appropriate to look only to the court's construction to determine claim scope.  *Cf. Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir. 2012) ("[I]n those cases in which the correct construction of a claim term necessitates a derivative construction of a non-claim term, a court may perform the derivative construction in order to elucidate the claim's meaning.").  Moreover, "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Haliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

Because the jury found the claims indefinite, we presume that it resolved the underlying factual issues relating to the construction of "seat position defined by the seat" in Arctic Cat's favor.  In other words, we presume that the jury found that a skilled artisan would not have been able to discern the dimensions of the standard rider depicted in Figures 9A, 9B, and 10 due to errors in the figures.  The question for our review is whether substantial evidence supports this implied fact finding.  We conclude that it does.

The undisputed construction of the term "seat position defined by the seat" expressly incorporates the dimensions for the "standard rider" in Figures 9A, 9B and 10.  Arctic Cat presented evidence that the listed dimensions for the "standard rider" depicted in these figures contained numerous errors.  For example, Arctic Cat presented expert testimony demonstrating to the jury that the overall height dimension did not equal the sum of the subdimensions for height and explained that a person of ordinary skill in the art would not have known whether it was the total height or subdimensions for height that were in error.  In other words, Arctic Cat provided evidence that a person of ordinary skill in the art would not have known whether the claimed seat position accommodated a rider with the disclosed overall height, or with the disclosed sub-dimensions.  Likewise, Arctic Cat presented expert testimony that there were numerous errors in the ground to lower arm, head depth, ground to ankle, and arm length measurements in the figures that would make it "nearly impossible" to build a custom dummy to these measurements.  J.A. 3661–62; *see also* J.A. 22709–25.  We conclude that this is substantial evidence to support a finding that a skilled artisan would not be able to discern the dimensions of the standard rider depicted in Figures 9A, 9B, and 10.  And this fact finding is sufficient to support the jury's conclusion that a person of ordinary skill in the art could not have reasonably

ascertained whether a particular seat position fell within the claim scope.

On appeal, Bombardier's primary argument is that a "seat position defined by the seat" is a standard element of snowmobiles and that a person of ordinary skill in the art would have known exactly how to determine whether a snowmobile contains this limitation. Bombardier points to its own expert evidence on this issue, including the expert's use of a standard 50th percentile adult male Anthropomorphic Test Dummy. Bombardier's expert testified at length as to why a person of ordinary skill in the art would understand the relevant dimensions for the 50th percentile adult male notwithstanding what it characterizes as minor errors in the figures. Even if we agreed with Bombardier that the evidence supports such a finding, our responsibility is not to review whether Bombardier's position was also supported by substantial evidence or to weigh the relative strength of Bombardier's evidence against Arctic Cat's evidence. As an appellate court, it is beyond our role to reweigh the evidence or consider what the record *might* have supported. Our review is limited to whether implied fact findings made by the jury are supported by substantial evidence in the record, and if so, whether those fact findings support the legal conclusion of indefiniteness. Because substantial evidence supports a finding that a person of ordinary skill in the art would not understand the dimensions of the "standard rider" in Figures 9A, 9B, and 10, the jury verdict must be sustained. Because we affirm the verdict of indefiniteness based on the unchallenged incorporation of Figures 9A, 9B, and 10 into the district court's claim construction, we do not reach the language "natural operating position"—Arctic Cat's separate ground for indefiniteness.

Bombardier also argues that the jury verdict cannot be sustained because Arctic Cat never argued the issue of indefiniteness at trial. While the district court prevented Arctic Cat from explicitly referencing indefiniteness while

questioning its witnesses, the jury was nevertheless instructed on indefiniteness.  Because the evidence presented at trial is sufficient to sustain the verdict, and neither party disputes the jury instructions, we conclude that a jury finding on this issue was proper.  We have considered Bombardier's remaining arguments with respect to the verdict form and find them unpersuasive.

## II

We next address Bombardier's argument that claim 6 of the '847 patent was not anticipated by the T/S Mod snowmobile as a matter of law.  Anticipation is a question of fact that we review for substantial evidence.  *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012) (citing *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007)).  Anticipation "requires a showing that each limitation of a claim is found in a single reference, either expressly or inherently." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) (citing *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1369 (Fed. Cir. 2005)).

Bombardier argues that substantial evidence does not support a finding that the T/S Mod discloses claim 6's requirement that the "rear ends of the front legs of the pyramidal brace assembly and the front ends of the rear legs of the pyramidal brace assembly are interconnected and form an apex not forward of the engine." '847 patent col. 15 ll. 17–20.  Bombardier contends that Arctic Cat's expert identified the apex as the top of the T/S Mod's pyramidal structure generally, without explaining how or why the legs "form" the apex.  Bombardier emphasizes that in the T/S Mod, the right front leg is attached to the right rear leg rather than the steering bracket, as depicted below.



Appellant's Br. 27 (citing J.A. 13471).

We are unpersuaded by Bombardier's argument. The claim does not require that all of the legs connect to the steering bracket; it merely requires that they be "interconnected and form an apex." '847 patent col. 15 ll. 19–20. The jury was shown pictures and a physical model of the T/S Mod, and Arctic Cat's expert described that the "front leg[s] and the rear legs converge" in a "pyramidal brace assembly" that has an "apex of the T/S Mod legs" in the area of the steering bracket. J.A. 3465 ll. 5–15; J.A. 3467 ll. 3–10. The photographs support a finding that the legs are "interconnected" as claim 6 requires, and also that the legs connect at "the uppermost part of the pyramidal brace assembly," the court's construction for the word "apex." Substantial evidence therefore supports the jury's finding that the T/S Mod discloses each limitation of claim 6.

## III

Finally, we address Bombardier's argument that claims 7 and 8 of the '847 patent would not have been obvious in view of the T/S Mod and Blade snowmobiles as a

matter of law.  Obviousness is a question of law based on underlying facts.  *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017) (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1326 (Fed. Cir. 2016)).  The factors underlying an obviousness inquiry—(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness—are reviewed for substantial evidence.  *Id.* (first citing *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48 (Fed. Cir. 2016) (en banc); then citing *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1068 (Fed. Cir. 2012)).  "Also a fact question is whether one of ordinary skill in the art had a motivation to combine the prior art to achieve the claimed combination."  *Id.* at 1359 (first citing *Apple*, 839 F.3d at 1047–48, 1051; then citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237–39 (Fed. Cir. 2010)).

Bombardier argues that Arctic Cat failed to establish that the "upper column" limitation in claims 7 and 8 would have been obvious in view of T/S Mod and Blade.  Bombardier highlights the evidence it presented demonstrating that a person of ordinary skill in the art would not have been motivated to combine a pyramidal brace assembly with an upper column.  Specifically, Bombardier cites trial testimony stating that a person of ordinary skill in the art would have regarded the upper column and pyramidal brace assembly as alternative support structures, and would not have included both due to the unwanted added weight.  *See* J.A. 3537.

Again, Bombardier asks us to favor its evidence over Arctic Cat's.  As described in background section IV *supra*, Arctic Cat presented evidence that upper columns had

been common features in snowmobiles for decades.[1]  Arctic Cat also presented evidence that the purpose of adding an upper column was to provide added strength, rigidity, and support to a frame, which are all desirable qualities in a snowmobile.  A reasonable fact finder could therefore conclude that a person of ordinary skill in the art would have understood the tradeoff between strength and weight, and would have been motivated to include an upper column for added strength.

Bombardier finally points to evidence it proffered as objective indicia of nonobviousness, including industry praise, commercial success, and copying.  A review of the record reveals that the jury heard contrary evidence regarding copying.  In addition, nearly all of Bombardier's evidence related to the patent's disclosure of a "pyramidal brace assembly," an element in the prior art T/S Mod snowmobile.  *See, e.g.*, J.A. 12989 (displaying Arctic Cat advertising stating that "[t]he pyramid designs of these race-proven chassis provide greater rigidity and strength").  Bombardier has not challenged on appeal that the prior art T/S Mod snowmobile included the "pyramidal brace assembly" limitation, and it has not demonstrated that any of its proffered evidence relates to the limitations that it has in fact challenged as nonobvious aspects of the claimed invention.  *See In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("For objective evidence of secondary

---

[1]  While Bombardier argues that specific pieces of prior art, namely the Blade snowmobile, fail to disclose an "upper column," it does not meaningfully dispute that upper columns were a common element of snowmobile frames that preexisted the '847 patent.  We understand Bombardier's primary argument to be that the *combination* of the upper column with the pyramidal brace assembly would not have been obvious to a person of ordinary skill in the art.

considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention.*") (quoting *Wyers*, 616 F.3d at 1246); *see also S. Alabama Med. Sci. Found. v. Gnosis S.P.A.,* 808 F.3d 823, 827 (Fed. Cir. 2015) (affirming a finding of no nexus where the patent owner "failed to connect the evidence of industry praise to the novel elements of the claims," given that "the praise was particularly directed to . . . an element already known in the prior art"); *Prometheus Labs., Inc. v. Roxane Labs., Inc*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015) (noting that the patentee bears the burden of production on nexus). We therefore reject Bombardier's contention that the strength of this evidence is sufficient to nullify the jury verdict.

CONCLUSION

We considered Bombardier's remaining arguments, but do not find them persuasive. Because we discern no error in the denial of judgment as a matter of law, we affirm the judgment of the district court.

**AFFIRMED**